UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION


MARCO ISLAND CABLE, INC., a Florida
corporation,

                    Plaintiff,

vs.                                    Case No.  2:04-cv-26-FtM-29DNF


COMCAST CABLEVISION OF THE SOUTH,
INC., a Colorado corporation,

                    Defendant.
_____


## OPINION AND ORDER

_____This matter came before the Court for a bench trial as to the declaratory judgment claim in Count II of plaintiff's Complaint, tried simultaneously with a jury trial as to a portion of Count I.[1] As to the remaining portion of Count I, the jury found Comcast had violated the Florida Deceptive and Unfair Trade Practices Act (FDUTPA) and awarded $3,267,392 in damages.  At the conclusion of the evidence, the parties requested to submit closing arguments in writing, which the Court allowed.  (Doc. #430, pp. 2094-95.)  Each side has submitted written arguments in support of their positions (Docs. #425, 426).  The Court makes the findings of fact and conclusions of law set forth below.

---

[1]The Court has issued several Opinions and Orders (Docs. #193, 221, 365, 384) disposing of other portions of the Complaint. Familiarity with these is assumed.

**I.**

In Count II of the Complaint (Doc. #2), Marco Island Cable, Inc. (MIC or plaintiff) sues Comcast Cablevision of the South, Inc. and Comcast Corporation (collectively Comcast or defendant) for a declaratory judgment under the Florida Declaratory Judgment Act, Fla. Stat. §§ 86.011 - 86.15. MIC asks the Court to "declare that all exclusive contracts for providing cable [television] services to residents of Collier County entered into by Comcast or its predecessors are null and void." (Doc. #2, ¶32.) Based on the Court's prior rulings, trial was confined to Multiple Dwelling Units (MDUs) on Marco Island, Florida.

MIC asserts that contracts entered between Comcast or its predecessors and the residents, condominium associations or developers which preclude condominium communities from utilizing the cable services of any provider other than Comcast are unenforceable as violations of Florida Statutes § 718.1232[2]. Plaintiff asserts that five kinds of exclusive arrangements utilized by Comcast violate § 718.1232: (1) provisions that expressly give Comcast the exclusive right to provide cable services at a condominium; (2) provisions that require all residents to pay Comcast for basic cable service, whether or not they want service from Comcast; (3) provisions that give Comcast

_____

[2]Count II also asserts a violation of Fla. Stat. § 542.18. The Court previously dismissed plaintiff's anti-trust claim under Fla. Stat. § 542.18, and therefore finds that plaintiff is not entitled to a declaratory judgment under this statute.

exclusive use of, or access to, the inside wiring necessary to provide cable service; (4) provisions that give Comcast the right to leave its facilities on the premises for up to six months after its right to provide cable service has ended; and (5) provisions that give Comcast an exclusive right of entry extending beyond the termination of Comcast's right to provide service.  Plaintiff asks the Court to permanently enjoin Comcast from entering into or enforcing the offending provisions of the contracts; to order that Comcast provide prompt written notice to all developers, associations, and residents who may be affected by such provisions; and to file a report documenting Comcast's compliance with this notice requirement.  (Doc. #425, p. 1.)

## II.

Count II is brought pursuant to the Florida Declaratory Judgment Act.  The Florida Declaratory Judgment Act is substantive law intended to be remedial in nature, and is to be liberally administered and construed.  Fla. Stat. § 86.101; Higgins v. State Farm Fire & Cas. Co., 894 So. 2d 5, 10-12 (Fla. 2004).  Courts are authorized "to declare rights, status and other equitable or legal relations, whether or not further relief is or could be claimed," and "its declaration may be either affirmative or negative in form and effect . . ."  Fla. Stat. § 86.011.  Courts "may render declaratory judgments on the existence or nonexistence: (1) Of any immunity, power, privilege, or right; or (2) Of any fact upon which the existence or nonexistence of such immunity, power, privilege,

or right does or may depend, whether such immunity, power, privilege or right now exists or will arise in the future." Fla. Stat. § 86.011.

A declaratory judgment action may be brought by "[a]ny person claiming to be interested or who may be in doubt about his or her rights under a . . . contract . . . or whose rights, status, or other equitable or legal relations are affected by a . . . contract . . ." in order to determine "any question of construction or validity arising under such . . . contract . . . ." Fla. Stat. § 86.021. This "does not limit or restrict the exercise of the general powers conferred in s. 86.011 in any action where declaratory relief is sought." Fla. Stat. § 86.051. "Any declaratory judgment rendered pursuant to this chapter may be rendered by way of anticipation with respect to any act not yet done or any event which has not yet happened, and in such case the judgment shall have the same binding effect with respect to that future act or event, and the rights or liability to arise therefrom, as if that act or event had already been done or had already happened before the judgment was rendered." Fla. Stat. § 86.051.

Two statutes from the Florida Condominium Act, Fla. Stat. §§ 718.101 - 718.622 are also relevant. The statute which plaintiff claims is being violated by Comcast is Florida Statute § 718.1232, which states:

-4-

> No resident of any condominium dwelling unit, whether
> tenant or owner, shall be denied access to any available
> franchised or licensed cable television service, nor
> shall such resident or cable television service be
> required to pay anything of value in order to obtain or
> provide such service except those charges normally paid
> for like services by residents of, or providers of such
> services to, single-family homes within the same
> franchised or licensed area and except for installation
> charges as such charges may be agreed to between such
> resident and the provider of such services.

The only Florida appellate case addressing this statute is Dynamic
Cablevision of Fla., Inc. v. Biltmore II Condo. Assoc., Inc., 498
So. 2d 632 (Fla. 3d DCA 1986). Dynamic Cablevision rejected the
cable provider's claim that the statute was violated when the
condominium association refused to allow exterior wiring by a new
cable provider and refused to pay the higher costs associated with
the interior installation of the wiring. Additionally, Fla. Stat.
§ 718.115(1)(d) provides:

> If so provided in the declaration, the cost of a master
> antenna television system or duly franchised cable
> television service obtained pursuant to a bulk contract
> shall be deemed a common expense. If the declaration does
> not provide for the cost of a master antenna television
> system or duly franchised cable television service
> obtained under a bulk contract as a common expense, the
> board may enter into such a contract, and the cost of the
> service will be a common expense but allocated on a
> per-unit basis rather than a percentage basis if the
> declaration provides for other than an equal sharing of
> common expenses, and any contract entered into before
> July 1, 1998, in which the cost of the service is not
> equally divided among all unit owners, may be changed by
> vote of a majority of the voting interests present at a
> regular or special meeting of the association, to
> allocate the cost equally among all units. The contract
> shall be for a term of not less than 2 years.
>
>> 1. Any contract made by the board after the
>> effective date hereof for a community antenna

system or duly franchised cable television
service may be canceled by a majority of the
voting interests present at the next regular
or special meeting of the association. Any
member may make a motion to cancel said
contract, but if no motion is made or if such
motion fails to obtain the required majority
at the next regular or special meeting,
whichever is sooner, following the making of
the contract, then such contract shall be
deemed ratified for the term therein
expressed.

2. Any such contract shall provide, and shall
be deemed to provide if not expressly set
forth, that any hearing-impaired or legally
blind unit owner who does not occupy the unit
with a non-hearing-impaired or sighted person,
or any unit owner receiving supplemental
security income under Title XVI of the Social
Security Act or food stamps as administered by
the Department of Children and Family Services
pursuant to s. 414.31, may discontinue the
service without incurring disconnect fees,
penalties, or subsequent service charges, and,
as to such units, the owners shall not be
required to pay any common expenses charge
related to such service. If less than all
members of an association share the expenses
of cable television, the expense shall be
shared equally by all participating unit
owners. The association may use the provisions
of s. 718.116 to enforce payment of the shares
of such costs by the unit owners receiving
cable television.

### III.

Plaintiff argues that Fla. Stat. § 718.1232 gives residents of
condominiums a statutory right to choose among available franchised
or licensed cable service providers, and gives franchised or
licensed cable service providers an enforceable right to serve any
resident who wants its service. The statute, plaintiff argues,
"broadly covers arrangements that have the practical effect of

preventing residents and qualified cable service providers from doing business with each other." (Doc. #425, p. 3.) Before addressing these contentions, some preliminary matters must be addressed.

## A. Contracts at Issue:

In its post-trial written closing argument, plaintiff identifies contracts for condominiums located at Vintage Bay (Plaintiff's Exh. 122); Stevens Landing (Plaintiff's Exh. 143); Vantage Point (Defendant's Exh. 202); Crescent Beach (Plaintiff's Exh. 73); Monterey (Defendant's Exh. 196); Southern Breeze (Defendant's Exh. 200); and Sunset Cove (Plaintiff's Exh. 63). Plaintiff also references the Tampico New Contract Cover Sheet (Plaintiff's Exh. 95), but the contract itself was not admitted. Other Comcast contracts with condominium associations were admitted at trial, but have not been discussed in plaintiff's closing argument: Belize (Plaintiff's Exh. 8); The Charter Club (Plaintiff's Exh. 185); Estuary I (Plaintiff's Exh. 75); Estuary II (Plaintiff's Exhs. 119, 146); Somerset (Defendant's Exh. 566); and South Seas (Plaintiff's Exh. 140).

MIC further contends that "many more examples of such contracts" exist which could be provided to the Court. (Doc. #425, p. 9 n.7.) The Court rejects this contention. The time to introduce evidence was at trial, and the Court will not entertain additional evidence offered at this late stage of the case. A

declaratory judgment is denied as to any contract which was not admitted as evidence at trial for lack of evidentiary support.

**B.   Case or Controversy Ripe for Adjudication and Standing:**

Comcast argues that there is no case or controversy ripe for adjudication because the evidence shows no MDU resident was individually denied access to any available franchised or licensed cable television service pursuant to a Comcast contract, and no evidence that Comcast or its customers read Comcast's current contracts as denying condominium residents access to other cable services.   Comcast asserts that plaintiff is simply seeking an advisory opinion, which is precluded in a declaratory judgment action.   (Doc. #426, pp. 3-5.)   On a related but distinct issue, Comcast argues that MIC has no standing to assert a declaratory judgment claim under Fla. Stat. § 718.1232.

**(1) Case or Controversy:**

Count II is a state law claim brought pursuant to the Florida Declaratory Judgment Act, Fla. Stat. § 86.01 et seq.; federal jurisdiction is premised on diversity of citizenship.   (Doc. #1, ¶2.)   Thus, Florida law governs and federal case law interpreting the federal Declaratory Judgment, 28 U.S.C. § 2201 et seq. is not applicable in this case.   Erie R.R. v. Tompkins, 304 U.S. 64 (1938); Hartford Accident & Indem. Co. v. Beaver, 466 F.3d 1289, 1291 (11th Cir. 2006).   Therefore, Comcast's reliance on such federal case law (Doc. #426, pp. 3-5) is misplaced.

The seminal description of a proper declaratory judgment action in Florida is set forth in May v. Holley, 59 So. 2d 636 (Fla. 1952):

> Before any proceeding for declaratory relief should be entertained it should be clearly made to appear that there is a bona fide, actual, present practical need for the declaration; that the declaration should deal with a present, ascertained or ascertainable state of facts or present controversy as to a state of facts; that some immunity, power, privilege or right of the complaining party is dependent upon the facts or the law applicable to the facts; that there is some person or persons who have, or reasonably may have an actual, present, adverse and antagonistic interest in the subject matter, either in fact or law; that the antagonistic and adverse interests are all before the court by proper process or class representation and that the relief sought is not merely the giving of legal advice by the courts or the answers propounded from curiosity.  These elements are necessary in order to maintain the statuts [sic] of the proceeding as being judicial in nature and therefore within the constitutional powers of the courts.

Id. at 639.  Thus, "there must be a bona fide need for such a declaration based on present, ascertainable facts or the court lacks jurisdiction to render declaratory relief. . . . there still must exist some justiciable controversy between adverse parties that needs to be resolved for a court to exercise its jurisdiction." Martinez v. Scanlan, 582 So. 2d 1167, 1170-71 (Fla. 1991).  Where there is no longer a bona fide, actual, or present need for a declaration, a court lacks jurisdiction to grant relief under the Florida Declaratory Judgment Act.  Santa Rosa County v. Administration Comm'n, Div. of Admin. Hearings, 661 So. 2d 1190 (Fla. 1995).

-9-

All contracts identified in plaintiff's post-trial memorandum are current contracts.  The Court finds that there is a bona fide need for declaratory relief as to these current contracts based on present, ascertainable facts as to plaintiff's rights (i.e., those rights plaintiff has standing to enforce, discussed below) under Fla. Stat. § 718.1232.  The Court finds the existence of a case and controversy as to such claims.  The Court finds no case or controversy, however, as to contracts which have expired, e.g., The Charter Club (Plaintiff's Exh. 185) and South Seas (Plaintiff's Exh. 140).  As to these contracts, there is no need for declaratory relief based on present facts as to plaintiff's rights.

**(2) Standing:**

For state law claims, "the doctrine of standing certainly exists in Florida, but not in the rigid sense employed in the federal system."  Department of Revenue v. Kuhnlein, 646 So. 2d 717, 720 (Fla. 1994).  "We do agree that, except as otherwise required by the constitution, Florida recognizes a general standing requirement in the sense that every case must involve a real controversy as to the issue or issues presented.  Put another way, the parties must not be requesting an advisory opinion, except in those rare instances in which advisory opinions are authorized by the [Florida] Constitution."  Kuhnlein, 646 So. 2d at 720-21 (citations omitted).  See also Reinish v. Clark, 765 So. 2d 197, 202 (Fla. 1st DCA 2000)(citation and quotation omitted).  "To

satisfy the requirement of standing, the plaintiff must show that a case or controversy exists between the plaintiff and the defendant, and that such case or controversy continues from the commencement through the existence of the litigation." Ferreiro v. Phila. Indemn. Ins. Co., 928 So. 2d 374, 377 (Fla. 3d DCA 2006). The liberal construction of the Florida Declaratory Judgment Act informs the Court's decision on standing. Olive v. Maas, 811 So. 2d 644, 648 (Fla. 2002).

Florida Statute § 718.1232 sets forth two rights applicable to a resident of a condominium dwelling unit and one right applicable to a cable service provider. First, "No resident of any condominium dwelling unit, whether tenant or owner, shall be denied access to any available franchised or licensed cable television service, . . ." Fla. Stat. § 718.1232. Since MIC is not a "resident of any condominium dwelling unit," MIC has no standing to enforce this access aspect of the statute or seek declaratory judgment concerning it.

Second, with two exceptions, no condominium dwelling unit resident or cable television service shall be required to pay anything of value in order to obtain or provide cable television service. Again, since MIC is not a condominium dwelling unit resident, it has no standing to assert this aspect of the statute on behalf of such a resident. However, since MIC is a cable television service provider, it enjoys a statutory right not to be required to pay anything of value in order to provide cable

-11-

television service to a condominium, except (1) those charges normally paid for like services by cable providers to single-family homes within the same franchised or licensed area, and (2) installation charges as may be agreed to between the condominium resident and the cable provider. The Court finds that MIC only has standing to assert this aspect of Fla. Stat. § 718.1232 on its own behalf.

Comcast asserts that even if plaintiff has rights under § 718.1232, plaintiff cannot sue a cable operator because such suit is not within the purview of Fla. Stat. § 718.303(1). This provision gives the association and a unit owner the right to sue certain entities (not including a cable service provider) for non-compliance with the Florida Condominium Act, the condominium's declaration, documents creating the association, and the association bylaws. It does not, however, restrict all suits for violation of the Florida Condominium Act to these entities. E.g., Dynamic Cablevision, 498 So. 2d at 635. The Court concludes that Fla. Stat. § 718.303(1) does not preclude MIC from suing to enforce its right under Fla. Stat. § 718.1232.

In sum, the Court finds that the issue before the Court for which plaintiff has standing and for which there is a case or controversy is whether the current Comcast contracts which were admitted as evidence at trial violate plaintiff's statutory right not to be required to pay anything of value in order to provide cable television service to a condominium, except (1) those charges

normally paid for like services by cable providers to single-family homes within the same franchised or licensed area, and (2) installation charges as may be agreed to between the condominium resident and the cable provider.

**IV.**

The Court will address the five types of contractual arrangements which plaintiff MIC asserts violate Fla. Stat. § 718.1232.   The Comcast MDU Distribution Network Schematic, Defendant's Exh. 561, is useful to keep in mind when reviewing the cable service agreements:



## A.   Exclusive Contracts:

Plaintiff asserts that contractual provisions which explicitly give Comcast the exclusive right to provide cable service at an MDU violate Fla. Stat. § 718.1232.   Three such contracts discussed in plaintiff's post-trial memorandum are the Vintage Bay, Stevens Landing, and Vantage Point contracts.   (Doc. #425, pp. 9-10.)[3]

(1)   **Vintage Bay Condominium Association:**   Effective October 27, 1994, Vintage Bay Condominium Association (Vintage Bay) entered into a Cable Television Installation and Service Agreement (Plaintiff's Exh. 147) with a Comcast predecessor (hereafter Comcast).   Under this Agreement, Vintage Bay appointed Comcast "as the sole and exclusive provider" of cable television and radio service to the Vintage Bay premises for a 15-year term, with renewable terms of five years, and gave Comcast an "exclusive license" which extended to each residential unit.   Comcast was required to provide cable television services, which included the design, installation, upgrading, and maintenance of the cable television service using coaxial cable and/or fiber optic line, amplifiers, and other equipment currently on the premises or to be added by Comcast (the "Equipment").   Comcast was given an "irrevocable easement in gross" with respect to the premises, and

---

[3]Five other current contracts are specifically non-exclusive (Belize, Crescent Beach, Estuary II, Southern Breeze, and Sunset Cove); two contracts are silent as to exclusivity (Estuary I and Monterrey).   None of these contracts violate Fla. Stat. § 718.1232 based on exclusivity.

all Equipment for delivery of cable services was the sole and exclusive property of Comcast.  Comcast was to establish individual accounts with the residents desiring cable service, and would bill and collect directly from the individual subscribers.  If the Agreement expired or was terminated, Comcast had the option of removing any or all of its Equipment or deactivating any and all of the Equipment, leaving it on the premises, and not allowing its use.

In April, 2003, Comcast offered Vintage Bay a bulk option agreement.  On July 28, 2003, Comcast and Vintage Bay executed a Compensation Agreement and a Bulk Bill Addendum (Plaintiff's Exh. 122).  In the Compensation Agreement, Comcast agreed to pay Vintage Bay a one time fee of $1,693.89 in consideration for the exclusive right to provide cable service to the premises for five years pursuant to the Bulk Bill Addendum.  The Bulk Bill Addendum supplemented the 1994 Cable Television Installation and Service Agreement.  It provided that Vintage Bay would pay Comcast a monthly service fee computed at $14.95 plus taxes and fees for each unit that had received a certificate of occupancy and which had been activated with Comcast's Total Basic Service at the request of the unit owner.  Individual unit owners would no longer be billed by Comcast.

**(2)  Stevens Landing Condominium Association, Inc.**:  On March 29, 2002, Comcast and Stevens Landing Condominium Association (Stevens Landing) entered into an Installation and Services

Agreement (Plaintiff's Exh. 143).  Comcast agreed to install, maintain and operate a cable communications system on the premises, and be responsible for all costs and expenses incurred in constructing the cable system.  All parts of the cable system would be and remain the personal property of Comcast, and the cable system could not be used by others.  Stevens Landing gave Comcast an exclusive right and license to construct, install, operate and maintain multi-channel video distribution facilities on the premises and to deliver cable services to the premises "unless otherwise required by applicable law."  Comcast agreed

> "not [to] interfere with the right of an individual
> resident to install or use his own private reception
> device, provided, however, that should any device or any
> facility belonging to a resident (or Association) not
> comply with the technical specifications established by
> the FCC, including, but not limited to, signal leakage,
> which interferes with [Comcast's] delivery of the
> Services, [Comcast] reserves the right to discontinue
> service to the Premises, or, at [Comcast's] discretion,
> the individual unit, until such non-conformance is cured
> by the Association or resident as the case may be.

The Agreement was for a twenty year term, which was automatically renewed unless terminated by either party.  After termination, service will revert to individual subscriber service, and Comcast is granted a non-exclusive right to provide cable television service on a voluntary basis to the individual unit associations for the length of Comcast's franchise and extensions with Collier County.  Upon termination of the Agreement, Comcast had six months in which it could, but was not required to, remove the system, including the cable home wiring and cable home run wiring.

-16-

A Bulk Bill Addendum (Plaintiff's Exh. 143) provided that service to the 72 residential units would start June 1, 2002, and that the Association would pay a monthly per unit service charge of $20.30 ($1,461.60 total) plus applicable fees and taxes.  The Bulk Bill Addendum was for an initial term of five years, and was automatically renewed unless terminated by either party.

**(3) Vantage Point Condominium Association, Inc.**:  On April 1, 2004, Comcast and Vantage Point Condominium Association, Inc. (Vantage Point) entered into a Bulk Installation and Services Agreement (Defendant's Exh. 202).  Comcast agreed to install, maintain and operate a broadband communications system on the premises, and be responsible for all costs and expenses incurred in constructing the broadband system.  Vantage Point had ownership of the home wiring, cable home run wiring, connectors, splitters, and wall plates, and this ownership remained with Vantage Point upon termination of the Agreement.  Ownership of all parts of the system installed by Comcast was the personal property of Comcast, excluding the cable home wiring and cable home run wiring.  No one else had the right to use the system or any portion of it for any reason.  Vantage Point gave Comcast an exclusive right and license to construct, install, operate and maintain multi-channel video distribution facilities on the premises and to deliver cable services to the premises "unless otherwise required by applicable law."  Comcast agreed

"not [to] interfere with the right of an individual
resident to install or use his own private reception
device, provided, however, that should any device or any
facility belonging to a resident (or Association) not
comply with the technical specifications established by
the FCC, including, but not limited to, signal leakage,
which interferes with [Comcast's] delivery of the
Services, [Comcast] reserves the right to discontinue
service to the Premises, or, at [Comcast's] discretion,
the individual unit, until such non-conformance is cured
by the Association or resident as the case may be.

The Agreement was for a five year term, after which it continued on
a month to month basis.  Upon termination of the Agreement, Comcast
had six months in which it could, but was not required to, remove
the system, excluding the cable home wiring and cable home run
wiring which was the property of Vantage Point.

A Bulk Bill Addendum (Defendant's Exh. 202) provided that for
the service to the 35 residential units, the Association would pay
a monthly per unit service charge of $14.50 ($507.50 total) plus
applicable fees and taxes.  The Bulk Bill Addendum was for an term
concurrent with the Agreement.

Plaintiff's post-trial memorandum argues without elaboration
that such exclusivity provisions violate Fla. Stat. § 718.1232.
Plaintiff's reliance upon the Court's summary judgment Opinion and
Order is misplaced, since the portion quoted merely found that
disputed facts precluded summary judgment.  Evidence at trial
established that plaintiff also utilizes exclusive agreements when
it provides cable services, such as The Charter Club agreement,
(Plaintiff's Exh. 138), entered after the Comcast contract expired.
Plaintiff has stipulated that it has contracts for longer than five

years with exclusivity provisions, and it has renewed contracts with exclusivity for longer than five years. Joint Pretrial Statement, (Doc. #299, p. 14). Additionally, plaintiff stipulated that "[e]xclusive agreements are not *per se* unlawful." Id. at p. 15. The Court concludes that the exclusivity provisions of the Comcast contracts at issue in this case do not violate Fla. Stat. § 718.1232. Plaintiff's request for a declaratory judgment to the contrary is denied.

**B.  Exclusive 100% Take-or-Pay Bulk Service Contracts:**

While both Comcast and MIC utilize exclusive bulk service contracts, MIC asserts that its are legal while Comcast's are in violation of Fla. Stat. § 718.1232. The distinction, MIC asserts, is that its exclusive bulk service contracts allow residents of MDUs to opt out and MIC then charges the condominium association only for the cable service actually received by residents. Comcast, on the other hand, requires that the condominium associations pay the Comcast bulk rate multiplied by the total number of units in the MDU, regardless of whether all units actually receive service from Comcast. (Doc. #425, pp. 10-14.)

Plaintiff's written closing argument refers to three contracts which have such provisions. The Stevens Landing Bulk Bill Addendum (Plaintiff's Exh. 143) provided that service to the 72 residential units would start June 1, 2002, and that the Association would pay a monthly per unit service charge of $20.30 ($1,461.60 total) plus

applicable fees and taxes.  The Vantage Point Bulk Bill Addendum
(Defendant's Exh. 202) provided that for service to the 35
residential units, the Association would pay a monthly per unit
service charge of $14.50 ($507.50 total) plus applicable fees and
taxes.  The Crescent Beach Bulk Bill Addendum (Plaintiff's Exh. 73)
provided that for service to the 117 residential units, the
Association would pay a monthly per unit service charge of $15.80
($1,848.60 total) plus applicable fees and taxes.

MIC argues that the practical effect of these provisions is
that the condominium associations assess each unit a monthly fee
for the cable services whether the unit resident elects to receive
Comcast services or not.  Thus, any unit resident who wanted to
receive cable services from another provider would have to pay that
provider _and_ the assessment for the Comcast bulk bill.  This,
plaintiff argues, violates Fla. Stat. § 718.1232 because "a
resident would essentially have to pay substantially more for basic
service in order to do business with a competitor [of Comcast]."
(Doc. #425, p. 13.)

As noted earlier, MIC does not have standing to assert claims
involving the unit residents' extra payment for services.  That
statutory right is vested in the residents, not a cable company.

Plaintiff also argues that these provisions violate the
statute because post-wiring a condominium is impractical.
Plaintiff asserts that such post-wiring is expensive and/or
aesthetically displeasing, thus significantly inhibiting its

-20-

ability to provide cable service to such condominiums.  (Doc. #425, pp. 2-3, 13.)

The Court finds that these contract provisions do not violate plaintiff's statutory rights under Fla. Stat. § 718.1232.  Indeed, Florida law specifically allows such contractual provisions by the condominium associations' board.  Fla. Stat. § 718.115(1)(d) provides in part:

> If the declaration does not provide for the cost of a master antenna television system or duly franchised cable television service obtained under a bulk contract as a common expense, the board may enter into such a contract, and the cost of the service will be a common expense but allocated on a per-unit basis rather than a percentage basis if the declaration provides for other than an equal sharing of common expenses, and any contract entered into before July 1, 1998, in which the cost of the service is not equally divided among all unit owners, may be changed by vote of a majority of the voting interests present at a regular or special meeting of the association, to allocate the cost equally among all units. The contract shall be for a term of not less than 2 years.

Even if post-wiring is expensive and unsightly, an association board is allowed to enter into the type of contract at issue here. Dynamic Cablevision, 498 So. 2d at 635.  Plaintiff's request for a declaratory judgment as to this issue is denied.

## C.  Exclusion for Use of Inside Wiring Not Owned by Comcast:

MIC argues: (1) that Fla. Stat. § 718.1232 requires that an incumbent cable provider make the wiring it installed and owns available for use by a qualifying competing cable operator, "presumably for fair compensation," if this is what is necessary to enable a resident to choose to take service from the competitor, or

(2) at the very least Fla. Stat. § 781.1232 invalidates agreements to deny competing cable providers access to wiring that the developer or association installed and that the incumbent (Comcast) does not own. (Doc. #425, pp. 14-15.) MIC argues that Comcast has contractual provisions which would violate the statute if it is so interpreted. MIC relies upon three contracts by Comcast. (Doc. #425, pp. 14-16.)

**(1) Monterrey Condominium Association, Inc.:** Comcast entered into a five-year Bulk Installation and Service Agreement with Monterrey Condominium Association, Inc. (Monterrey) (Plaintiff's Exh. 215) on October 29, 2003, effective January 1, 2004. Monterrey wanted to upgrade the cable services to provide broadband services to the residents, and granted access to the premises in order for Comcast to upgrade the distribution plant and equipment. Comcast was granted the right to construct, install, maintain, use, operate, upgrade and repair certain items: "cabling, wiring, fiber optic lines, power supplies, converters, amplifiers, distribution wiring, molding, network system and equipment, and components associated therewith, which may become necessary or useful, for the provision of the Service (the "System")." The Agreement specifically agreed to ownership:

> "The ownership of all parts of the System installed by [Comcast] shall be and will remain the personal property of [Comcast]. The ownership of all cable home-run wiring, connectors and splitters from [Monterry's] telephone/cable room to and within the residential dwellings shall be and remain the property of [Monterrey]. [Comcast] agrees, however, to maintain this

> property in order to provide cable Service to and within
> the residential dwelling units.  At no time during or
> after the term hereof shall [Monterrey] or any third
> party have the right to use the System or any portion
> thereof for any purpose, except upon the expiration or
> termination of this Agreement, [Monterrey] shall have the
> right to use those portions of the System installed by
> [Monterrey]."

Upon termination of the Agreement, Comcast had six months in which it was entitled, but not required, to remove the System, but was not allowed to remove portions of the System owned or installed by Monterrey.  A Bulk Bill Addendum dated October 23, 2003 agreed to a monthly per unit service fee of $11.50 for 136 residential units, for a total of $1,564.00 per month.  (Plaintiff's Exh. 215.)

**(2) Southern Breeze Gardens Condominium Association, Inc.:**
Comcast entered into a five-year Bulk Installation and Service Agreement with Southern Breeze Gardens Condominium Association, Inc. (Southern Breeze) (Plaintiff's Exh. 56) on April 28, 2003. Southern Breeze wanted to provide broadband services to the residents, and granted a non-exclusive and irrevocable License for access to the premises in order for Comcast to route and install the broadband system for the premises.  Comcast was granted the right to construct, install, maintain, use, operate, control, upgrade and repair certain items: "cabling, wiring, fiber optic lines, power supplies, converters, amplifiers, risers, conduits, distribution wiring, molding, network system and equipment, facilities and components associated therewith, and other equipment or facilities necessary or useful, or which may become necessary or

useful, for the provision of the Services (the "System") whether installed by [Comcast] or [Southern Breeze]."  The Agreement specifically agreed to ownership:

> "The ownership of all parts of the System installed by [Comcast] shall be and will remain the personal property of [Comcast].  At no time during or after the term hereof shall [Southern Breeze] or any third party have the right to use the System or any portion thereof for any purpose, except upon the expiration or termination of this Agreement, [Southern Breeze] shall have the right to use those portions of the System installed by [Southern Breeze] and if [Comcast] fails to remove that portion of the System installed by them within six (6) months of the termination of this Agreement, it shall be considered abandoned and useable by [Southern Breeze] or a third party."

A Bulk Bill Addendum dated April 28, 2003 agreed to a monthly per unit service fee of $14.95 for 28 residential units, for a total of $418.60 per month.  (Plaintiff's Exh. 56.)

**(3) Sunset Cove Condominium Association:**  Comcast entered into a five-year Broadband Services Agreement with Sunset Cove Condominium Association of Marco Island, Inc. (Sunset Cove) (Plaintiff's Exh. 63) on January 1, 2005.  Sunset Cove wanted to provide broadband services to the residents, and granted a non-exclusive and irrevocable License for access to the premises in order for Comcast to route and install the broadband system for the premises.  Comcast was granted the right to construct, install, maintain, use, operate, control, upgrade and repair certain items: "cabling, wiring, fiber optic lines, power supplies, converters, amplifiers, distribution wiring, risers, conduits, distribution wiring, molding, network system and equipment, facilities and

components associated therewith, and other equipment or facilities necessary or useful, ow which may become necessary or useful, for the provision of the Services (the "System") whether installed by [Comcast] or [Sunset Cove]."   The Agreement specifically agreed to ownership:

> "The ownership of all parts of the System installed by [Comcast] shall be and will remain the personal property of [Comcast].  At no time during or after the term hereof shall [Sunset Cove] or any third party have the right to use the System or any portion thereof for any purpose, except upon the expiration or termination of this Agreement, [Sunset Cove] shall have the right to use those portions of the System installed by [Sunset Cove]."

Upon termination of the Agreement, Comcast had six months in which it was entitled, but not required, to remove the System, but was not allowed to remove portions of the System owned or installed by Sunset Cove.  A Bulk Bill Addendum dated January 1, 2005 agreed to a monthly per unit service fee of $18.75 for 36 residential units, for a total of $675.00 per month.  (Plaintiff's Exh. 63.)

The Court rejects plaintiff's assertion that Comcast cannot lawfully claim ownership of any cable home run wiring or home wiring in Collier County based upon Comcast's stipulation (Plaintiff's Exh. 4) that it did not pay personal property taxes on such wiring during the last five years.  (Doc. #425, p. 15.)  The stipulation did not agree that Comcast was required to pay taxes, only that it had not done so.  Whatever the tax ramifications may be, some contracts clearly establish that the wiring was Comcast's personal property.

Plaintiff reads the statute more broadly than it is written. The Monterrey, Southern Breeze Gardens, and Sunset Cove Condominium Association Boards agreed to an arrangement in which Comcast retained ownership of "all parts of the System installed by [Comcast]."   Nothing in Fla. Stat. § 718.1232 prohibits this sort of agreement; in fact, such agreement is authorized by the Fla. Stat. § 718.115(1)(d) and <u>Dynamic Cablevision</u>.   Further, the Agreements specify that no third party shall "have the right to use the System or any portion thereof for any purpose" until or unless the Agreements are terminated or expire.   Nothing in statute requires shared use of the System or that an incumbent cable company make the wiring it installed and owns available for use by a qualifying competing cable operator.   Plaintiff's request for a declaratory judgment on this issue is denied.

**D.  Leave Facilities in Place 6 Months after Termination:**

MIC argues that Comcast contracts have a standard provision which, with some minor variations, gives Comcast the right to leave its facilities at an MDU for up to six months after its right to service the MDU has expired.   MIC relies on provisions in the Monterey and the Stevens Landing agreements (summarized above).

Plaintiff cites a negotiation letter on behalf of Crescent Beach condominium which pointed out that Crescent Beach could not install a parallel redundant system in the building while the Comcast system was in place, and if Comcast took the entire six months to pull its system, and it took three months to install a

new system, the building would be without cable service for nine months. (Plaintiff's Exh. 280.)  As a result of negotiation, a much shorter window of removal was agreed upon in the Crescent Beach agreement.  MIC concludes: "Given the ubiquity of Comcast's 6-month provision, its great potential for undermining the rights that Section 718.1232 bestows upon residents of condominiums and competitive cable service providers, and the inability of all but 'unusually astute' representatives of associations to understand how Comcast can use it [sic] coerce renewal of its service agreements, the Court should declare that provision is unlawful and unenforceable under Section 718.1232." (Doc. #425, p. 17.)

Plaintiff's argument proves too much.  It is clear that this is a matter of negotiation between Comcast and the individual condominium association.  Calling one association's representative more astute does not render the other contracts a violation of Florida Statute § 718.1232.  The Court finds that the 6-month provision does not violate Fla. Stat. § 718.1232.  Therefore plaintiff's request for a declaratory judgment is denied.

**E.  Exclusive Right of Entry That Extends Beyond Term of Service:**

MIC argues that Comcast utilizes exclusive right-of-entry agreements that extend beyond the term of its service agreements, in violation of Fla. Stat. § 718.1232.  MIC relied upon the Stevens Landing and the Tampico contract, although no Tampico contract was introduced at trial.

As summarized above, the Stevens Landing Installation and Service Agreement (Plaintiff's Exh. 143) provides that it "shall remain in force for an initial term of twenty years" and "was automatically renewed for like terms, unless terminated by either party as provided below." The Bulk Bill Addendum provided that its initial term was five years, and "shall be automatically renewed for like terms, unless terminated by either party as provided below." This would require, according to MIC, that the MDU either renew their bulk agreement or go to an individually billed procedure for the years remaining under the Agreement. This, plaintiff asserts, violates "the letter and spirit of Section 718.1232." (Doc. #425, p. 18.) The Court disagrees, and finds that whatever the negotiated incentive to renew provided by the Bulk Bill Addendum may be, it does not violate Florida Statute § 718.1232.

Accordingly, it is now

**ORDERED:**

1.   Pursuant to this Court's Opinion and Order (Doc. #193), the Clerk shall enter judgment in favor of Comcast Cablevision of the South, Inc. as to any and all claims relating to geographic areas other than the City of Marco Island, and plaintiff Marco Island Cable, Inc. shall take nothing as to such claims.

2.   Pursuant to this Court's Opinion and Order (Doc. #365), the Clerk shall enter judgment against Marco Island Cable, Inc. as to all but the Florida Deceptive and Unfair Trade Practices Act

portion of Count I and to Count III, and Marco Island Cable, Inc. shall take nothing as to these claims.

3. Pursuant to the Jury Verdict (Doc. #416) in which the jury found Comcast Cablevision of the South, Inc. had violated the Florida Deceptive and Unfair Trade Practices Act, the Clerk shall enter judgment against Comcast Cablevision of the South, Inc. and in favor of Marco Island Cable, Inc. in the amount of $3,268,392.00.

4. Pursuant to this Opinion and Order, the Clerk shall enter judgment **DENYING** Marco Island Cable, Inc.'s request for declaratory judgment that all exclusive contracts for providing cable services to residents of Marco Island, Collier County, Florida entered into by Comcast Cablevision of the South, Inc. or its predecessors are null and void.

5. The Clerk shall terminate any remaining pending motions as moot and close the case.

**DONE AND ORDERED** at Fort Myers, Florida, this __8th__ day of March, 2007.

JOHN E. STEELE
United States District Judge

Copies:
Counsel of record